Jay W. Eisenhofer (Bar No. JWE5503)
Michael J. Barry
Jeff A. Almeida
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone:    (646) 722-8500
Facsimile:    (646) 722-8501

*Attorneys for Plaintiff and Proposed*
*Lead Plaintiff for the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

08 CV 5317



---

| | |
|---|---|
| *CITY OF RICHMOND RETIREMENT SYSTEM* on behalf of itself and all others similarly situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>*GLOBAL CASH ACCESS HOLDINGS, INC.;* *GLOBAL CASH ACCESS, INC.; KIRK SANFORD, KARIM MASKATIYA; HARRY C. HAGERTY, III; ROBERT CUCINOTTA; M&C INTERNATIONAL; SUMMIT PARTNERS, L.P.; GOLDMAN SACHS & CO., INC.; J.P. MORGAN SECURITIES, INC.; and, DELOITTE & TOUCHE, LLP* )<br><br>Defendants. ) | **CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

**Page**

I.      SUMMARY OF THE ACTION ................................................................. 1

II.     JURISDICTION AND VENUE ................................................................. 6

III.    PARTIES ................................................................................................ 7

      A.      Plaintiff ....................................................................................... 7

      B.      Defendants GCAH and GCA ........................................................ 7

      C.      The Individual Defendants ............................................................ 8

      D.      The Insider Selling Entities .......................................................... 9

      E.      The Underwriter Defendants ........................................................ 10

      F.      Deloitte & Touche LLP ............................................................... 11

IV.     CONTROL PERSON ALLEGATIONS/GROUP PLEADING ...................... 12

V.      DEFENDANTS' FRAUDULENT SCHEME ............................................. 15

      A.      GCAH Delays The Filing Of Its 10-Q Pending A Confidential,
            Internal Investigation ................................................................... 16

      B.      GCAH Concludes Its Investigation With Additional Commission Payouts
            "Possible" ................................................................................... 18

VI.     THE DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND/OR
      OMISSIONS .......................................................................................... 19

      A.   Defendants' False And Misleading Statements During 2005 .................... 19

      B.   Defendants' False And Misleading Statements During 2006 .................... 20

      C.   Defendants' False And Misleading Statements During 2007 .................... 24

VII.    APPLICABLE GAAP VIOLATIONS ....................................................... 30

VIII.   SCIENTER/FRAUDULENT INTENT ...................................................... 32

      A.      The Individual Defendants ............................................................ 32

B. The Underwriter Defendants.................................................................34

C. Deloitte & Touche LLP ....................................................................36

D. All Named Defendants Had A Common Motive And Opportunity To Lie .........36

    1. Defendant Maskatiya's and Cucinotta's Insider Trading ........................ 37

    2. Defendant Sanford's Insider Trading........................................... 37

    3. Defendant Hagerty's Insider Trading ......................................... 38

    4. The Underwriting Defendants.................................................. 38

    5. Defendant Deloitte ............................................................38

IX. FRAUD ON THE MARKET............................................................... 39

X. NO SAFE HARBOR ...................................................................... 39

XI. LOSS CAUSATION........................................................................ 41

XII. CLASS ACTION ALLEGATIONS ...................................................... 43

XIII. COUNTS.................................................................................... 46

XIV. PRAYER FOR RELIEF ................................................................... 54

XV. JURY DEMAND ........................................................................... 55

City of Richmond Retirement System ("Richmond" or "Plaintiff"), individually and on behalf of all other persons and entities who purchased or otherwise acquired securities issued by Global Cash Access Holdings, Inc. ("GCAH" or the "Company") from September 22, 2005 to November 14, 2007, inclusive (the "Class Period"), by its undersigned attorneys, for its Complaint, allege the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Plaintiff's information and belief is based on its investigation (made by and through its attorneys), which investigation included, *inter alia*, a review and analysis of: (1) public documents pertaining to GCAH and the Defendants (defined *infra*); (2) GCAH's filings with the Securities and Exchange Commission ("SEC"); (3) press releases, earnings releases and public statements published by GCAH; (4) GCAH press conferences, analyst conference calls, and the Company's website; (5) analyst reports concerning the Company; and (6) newspaper and magazine articles (and other media coverage in the financial press) regarding GCAH, its business or the Defendants.

Many of the facts supporting the allegations contained herein are known only to the Defendants named hereunder or are exclusively within their custody and/or control. Plaintiff believes that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.    This is a federal securities class action brought on behalf of all purchasers of GCAH's publicly-traded securities during the Class Period. This class action arises out of (1) materially misleading statements and omissions made in connection with the initial public offering ("IPO" or the "Offering") of GCAH which took place pursuant to a prospectus (the

"Prospectus") filed on September 22, 2005 as part of a Form S-1/A registration statement (the "Registration Statement"); (2) materially misleading statements and omissions made in connection with the secondary offering (the "Secondary Offering") which took place pursuant to a prospectus (the "Second Prospectus") filed on May 24, 2006 as part of a Form S-1/A registration statement (the "Second Registration Statement"); and (3) various materially misleading statements and omissions made in connection with SEC filings, earnings releases and financial reports, and other public press releases made by, or controlled by, the Defendants named herein occurring throughout the Class Period. All of such materially misleading statements and omissions served to artificially-inflate the price of GCAH securities causing the purchasers of GCAH securities to suffer significant damages when a series of corrective disclosures by the Company caused the truth to be revealed.

2.    Headquartered in Las Vegas, Nevada, GCAH, through a subsidiary, provides cash access and customer relationship marketing technologies to the gaming industry. The Company's products and services allow patrons at gaming establishments (*e.g.*, casinos), throughout the United States and internationally, to access cash through a variety of methods including ATM cash withdrawals, credit card cash advances, point-of-sale debit card transactions, check verification and warranty, and money transfers.

3.    On September 22, 2005, GCAH went public, offering 16,064,157 shares of its common stock at a price of $14.00 per share. Of the over 16 million shares offered and sold, 9 million of those shares were being sold on behalf of the Company while over 7 million were being sold by insider selling stockholders looking to cash out. Based upon the materially misleading information that GCAH disseminated and the true facts that it concealed in its Prospectus and Registration Statement, detailed further herein, GCAH enjoyed a successful,

well-subscribed IPO, raising approximately $250 million in gross proceeds from members of the investing public.

4.     Buttressed by the purportedly strong results and forecasts of the Defendants, GCAH stock price soared to a Class Period high of $19.46 on April 28, 2006, only seven months after the IPO.  On May 25, 2006, the Company completed a Secondary Offering of an additional 10.4 million shares of its common stock at a price of $15.75 per share.  All of the shares in the Secondary Offering were sold by insider selling stockholders (*i.e.*, the Company did not receive any proceeds from the shares sold in the Secondary Offering) and these insider stockholders received over $150 million in gross proceeds as a result.

5.      GCAH's swift rise was short-lived.  Beginning in July 2007, a group of high ranking members of GCAH's management team abruptly left the Company.  Harry C. Hagerty, III, the Company's Chief Financial Officer (CFO), left in July 2007.  William H. Harris, a member of GCAH's Board of Directors and the Audit Committee of the Board, left in August 2007.   Months later, in October 2007, GCAH announced that its President and Chief Executive Officer (CEO), Kirk Sanford, would be leaving the Company to purportedly "pursue other interests and spend time with his family."  The exodus of these high ranking executives and a member of the Board's Audit Committee raised serious red flags with analysts and investors, and when combined with disappointing guidance in August of 2007, GCAH's stock nose-dived to around $10 per share.  But the worst was yet to come.

6.     On November 14, 2007, after the close of the markets and only two weeks after its President and CEO resigned, GCAH announced that it would be delaying the filing of its Quarterly Report Form 10-Q for the period ending September 30, 2007, pending an internal investigation under the direction of an independent committee of the Board, with the assistance

of independent counsel, into undisclosed allegations being raised by a whistleblower. The market's reaction to this news was severe. GCAH's stock price plummeted $5.41 per share from $9.20 on November 14, 2007 to $3.71 per share on November 15, 2007 – a one day decline of 60% on extremely heavy trading volume of nearly 3.8 million shares (versus the average daily volume of less than 500K shares). In this one trading day, over $400 million of market capitalization was wiped out.

7.    In December 2007, the Company, through its new CEO, Scott Betts, announced that the investigation involved issues pertaining to the calculation of commissions which, according to the allegations of the whistleblower, the Company was "miscoding" for the purpose of avoiding payment of certain transaction fees. Betts disclosed that the internal review uncovered miscalculation issues relating to approximately 20 of GCAH's customers, and also issues with the reporting of transactions for these 20 customers and approximately 120 others. Betts estimated that the total financial impact of the internal investigation, including commission calculation issues and fixing internal systems and controls, would not exceed more than $10 million.

8.    On January 30, 2008, GCAH finally filed its delayed 10-Q, which revealed that the Company's financial statements in prior reporting periods were misstated. The Company would record $2.6 million in additional commission costs (all of which were recorded as additional commission expense, which is a cost of revenue to the Company) for the quarter ending September 30, 2007. Of that amount, $1.9 million related to transactions completed in 2005 and 2006. Another $4.3 million in costs would be recorded in the fourth quarter relating to legal, accounting, and other investigative fees. The Company also disclosed that it was "reasonably possible" that there would be disputes with the relevant customers regarding the

amounts of the commissions withheld which could precipitate the payment of additional sums to settle various disputes relating to the Company's non-payment of commissions.

9.     Because GCAH competes in a highly-competitive industry, where one cash access vendor could easily be replaced by another on any given casino floor, the impact of these revelations on the market's perception of GCAH's business going forward was dramatic.  GCAH faces the loss of current customers and the risk that new customers will hesitate to do business with it just long enough for a competitor to step in the door – serious and material risks that the Company has repeatedly acknowledged and stressed.  Not surprisingly, GCAH's stock price has hardly recovered as analysts and investors harbor concerns over these significant risk factors given the issues that continue to linger over the Company.

10.     As set forth below, the Defendants herein engaged in a fraudulent scheme during the Class Period to artificially inflate the price of GCAH securities by issuing a series of materially false and misleading statements regarding the Company's practices, policies and internal controls and the impact of the same on its financial performance – essentially understating the Company's costs of revenues and liabilities, while at the same time over-stating its gross profit margins and net income.

11.     More specifically, GCAH fraudulently and recklessly concealed and misrepresented from investors that (a) the Company's internal controls were deficient, or were disregarded, causing it to be unable or unwilling to accurately calculate the amount of commissions payable to the Company's customers; (b) GCAH had improperly computed the amount of commissions it was required to pay many of its customers resulting in the Company failing to comply with contractual terms, SEC rules and regulations, and federal securities laws; and (c) GCA's operating expenses (*i.e.* cost of revenues) during at least 2005 and 2006 were

understated resulting in an overstatement of gross profit margins and net income at least for the periods December 31, 2005, December 31, 2006, and for the quarters ending March 31, 2007 and June 30, 2007.

12.    As with most frauds, Defendants' motive was greed.  GCAH insiders and other firms involved in and profiting from the IPO (named as Defendants herein) misstated and concealed material information in their haste to go public and cash in.  In addition, as GCAH's stock price soared after its successful and well-subscribed IPO and Secondary Offering, and rose to new highs on the strength of the Defendant-created illusion that GCAH had a burgeoning customer base and increasing revenues supported by solid internal controls and state-of-the-art technologies (which purportedly served to reduce the Company's operating costs), Defendants reaped huge profits through insider trading on the adverse, non-public information concealed from investors.

## II.    JURISDICTION AND VENUE

13.    The claims of Plaintiff alleged herein arise, *inter alia*, under Sections 11, 12(a)(2) and 15 of the  Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77(a)(2) and 77o, respectively; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and Sections 20(a) and 18 of the Exchange Act, 15 U.S.C. §§ 78t(a) and 78r(a),  respectively.

14.    This Court has subject-matter jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1367.

15.    Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391.  Many of the misrepresentations, acts and practices complained of herein occurred in substantial part in this District, including the closing

of the IPO and Secondary Offering, and several Defendants, including the Underwriter Defendants (defined *infra*), maintain their primary place of business in this District.

16.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange.

## III.    PARTIES

### A.    Plaintiff

17.     Plaintiff City of Richmond Retirement System ("Richmond"), established in 1952, manages the pension assets for the City of Richmond public workers.  Richmond presently manages assets totaling approximately $550 million for its more than 9800 members.  Richmond purchased 34,255 shares of GCAH traceable to GCAH's initial public offering (IPO) and GCAH's Secondary Offering, and on the open market during the Class Period, and has been damaged as a result of the misstatements, omissions, acts and conduct alleged herein.[1]

### B.    Defendants GCAH and GCA

18.     Defendant GCAH is a Delaware corporation and holding company whose principal asset is 100% of the stock of its operating subsidiary, Global Cash Access, Inc. ("GCA").[2]  GCAH and GCA maintain their principal executive offices in Las Vegas, Nevada.  According to the Company, GCA is a financial services company and one of the world's leading cash access providers, with operations on over 1,000 gaming properties and other clients in the United States, Continental Europe, the United Kingdom, Canada, the Caribbean and Asia.

---

[1] Attached as Exhibit A to this Complaint is the Certification of City of Richmond Retirement System which, *inter alia,* attests to the purchases of GCAH's securities and the subsequent losses suffered as a result of the acts and omissions set forth herein.

[2] For purposes of this Complaint, "GCAH" will be used to refer to both GCAH and GCA.

GCA's products and services provide gaming establishment patrons access to cash through a variety of methods, including ATM cash withdrawals, point-of-sale debit card transactions, credit card cash advances, check verification and warranty services, and Western Union money transfers. According to its website, GCA provides products and services that improve credit decision-making, automated cashier operations and enhanced patron marketing activities for gaming establishments through its state-of-the-art, proprietary technologies designed to "increase client profitability, operational efficiency and customer loyalty."

### C.     The Individual Defendants

19.     Defendant Kirk Sanford ("Sanford") served as the Company's President and Chief Executive Officer since 1999. At the time of the IPO, Sanford was the President, Chief Executive Officer and a member of the Board of Directors of GCAH. Sanford joined the Board in March 2005 and remained on the Board until his resignation in October 2007. Sanford was a member of the Company's management committee when the Company conducted its operations as a limited liability company from 1998 through May 2004. Before serving as the Company's Chief Executive Officer, Mr. Sanford was the Company's Executive Vice President of Sales, Marketing and Product Development from 1998 to 1999. Sanford, either personally or through an attorney-in-fact, signed the Company's Registration Statement, and the Company's Annual Report Form 10-Ks for the periods ending December 31, 2005 and December 31, 2006, and the Company's Quarterly Reports for the quarters ending March 31, 2007 and June 30, 2007.

20.     Defendant Harry C. Hagerty, III, ("Hagerty") served as the Company's Executive Vice President and Chief Financial Officer from July 2004 to July 2007. Hagerty, either personally or through an attorney-in-fact, signed the Company's Registration Statement, and the Company's Annual Report Form 10-Ks for the periods ending December 31, 2005 and

December 31, 2006, and the Company's Quarterly Reports for the quarters ending March 31, 2007 and June 30, 2007. On July 24, 2007, Hagerty was relieved of his positions at GCA.

21.     Defendant Karim Maskatiya ("Maskatiya") was a co-founder of GCA and, at the time of the IPO and throughout the Class Period, was Co-Chairman of the Board of Directors. Maskatiya either personally or through an attorney-in-fact signed the Registration Statement and Second Registration Statement.  Maskatiya beneficially owned 50% of Defendant M&C International and during the Class Period served as M&C International's President and Chairman.  M&C offered and sold 2,774,870 shares of GCA Common Stock in the IPO. Maskatiya maintains his principal place of business at M&C's offices located at 643 River Oaks Parkway, San Jose, California 95134.

22.     Defendant Robert Cucinotta ("Cucinotta") was a co-founder of GCA and, at the time of the IPO and throughout the Class Period, was a Director of GCA.  In that capacity, either personally or through an attorney-in-fact, Cucinotta signed the Registration Statement and Second Registration Statement.  Cucinotta beneficially owned 50% of M&C International and during the Class Period served as M&C International's Secretary.  M&C sold 2,774,870 shares of GCA Common Stock in the IPO.  Cucinotta maintains his principal place of business at M&C International's offices located at 643 River Oaks Parkway, San Jose, California, 95134.

23.     Defendants Sanford, Hagerty, Maskatiya and Cucinotta are collectively referred to herein as the "Individual Defendants."

**D.     The Insider Selling Entities**

24.     Defendant M&C International ("M&C") is a holding company located in San Jose, California, 50% of which is beneficially owned by Defendant Maskatiya and 50% of which is owned by Defendant Cucinotta.  Prior to the time of the IPO, M&C beneficially owned

27,748,698 shares of GCA Common Stock consisting 38.69% of GCA's outstanding Common Stock of which it offered and sold 2,774,870 shares in the IPO for total net proceeds of more than $36 million.

25.    Defendant Summit Partners, L.P. ("Summit Partners") is an investment fund located at 499 Hamilton Avenue, Suite 200, Palo Alto, California 94301.  Summit Partners prior to the IPO beneficially owned 25,040,808 shares of GCA Common Stock constituting 34.91% of GCA's outstanding common stock of which it offered and sold 2,504,081 shares in the IPO for total net proceeds of more than $32.5 million.

### E.    The Underwriter Defendants

26.    Defendant Goldman Sachs & Co., Inc. ("Goldman Sachs") is an investment banking firm which maintains its principal executive offices at 85 Broad Street, New York, New York 10004.  Goldman Sachs acted as a co-lead underwriter with respect to the IPO and was directly responsible for the distribution and sale of at least 4,016,040 of the shares sold in the IPO with respect to which the $0.98 per share underwriting discount resulted in total fees of $3,937,719.20.

27.    Defendant J.P. Morgan Securities, Inc. ("JP Morgan") is an investment banking firm which maintains its principal executive offices at 270 Park Avenue, New York, New York 10017.  JP Morgan acted as a co-lead underwriter with respect to the IPO and was directly responsible for the distribution and sale of at least 4,016,040 of the shares sold in the IPO with respect to which the $0.98 per share underwriting discount resulted in total fees of $3,937,719.20.   In addition, JP Morgan Chase Bank, a corporate affiliate of Defendant JP Morgan, acted as trustee for First Plaza Group Trust, which offered 205,990 shares of GCA Common Stock for sale in the IPO.

28.    Defendants Goldman Sachs and JP Morgan are collectively referred to herein as the "Underwriter Defendants."

F.    **Deloitte & Touche LLP**

29.    Defendant Deloitte & Touche LLP ("Deloitte") is a Delaware limited liability partnership headquartered in New York.  Deloitte and its various affiliates and member firms were directly, indirectly and/or collectively involved in auditing GCAH, and its predecessor entities, since 2000, and continued to serve in this role throughout the Class Period.  Deloitte and its affiliated and subsidiary companies played an integral part in the conduct, acts and omissions described below.  Deloitte was engaged by GCAH to provide independent auditing and/or consulting services to GCAH, including the preparation, examination and/or review of GCAH's Registration Statement, Prospectus, Second Registration Statement, Second Prospectus, and consolidated financial statements for fiscal years 2005 through 2007 (and related public statements and filings) which were disseminated to public investors.  Year after year, from 2005 through 2007, Deloitte issued clean audit reports concerning GCAH.  During the Class Period, Deloitte and its member firms received millions of dollars in fees.

30.    Deloitte not only audited GCAH's materially false and misleading financial statements during the Class Period, but itself issued materially false and misleading opinions on those financial statements.  Deloitte also consented to the use of its statements on GCAH's financial statements and reports that were filed with the SEC and otherwise disseminated to the investing public during all relevant periods.  Deloitte reviewed, prepared, directed and controlled all public financial disclosures, including public filings, statements to the press and investing public, earnings releases, and press releases relating to financial issues of GCAH, made by the

Company during all relevant periods. Deloitte thus participated in the scheme, plan and common course of conduct described herein.[3]

## IV.    CONTROL PERSON ALLEGATIONS/GROUP PLEADING

31.    By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information regarding the Company's true state of affairs vis-à-vis miscoding of commissions, lack of adequate internal controls, and its resultant effect on the Company's reported costs of revenue, liabilities, gross profit margins and net income. The Individual Defendants also had access to undisclosed adverse information regarding the Company's business, operations, operational trends, finances, and present and future business prospects. The Individual Defendants learned and understood such information through GCAH's internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as GCAH officers and/or directors. By virtue of their positions, and their unique and unfettered access to Company information, the Individual Defendants were, therefore, responsible for the truthfulness and accuracy of the Company's public reports, SEC filings and press releases.

32.    The Individual Defendants are liable for the materially false and misleading statements and omissions of material facts contained in GCAH's SEC filings and press releases as such statements represent "group published" information and were disseminated to the public as a result of the collective actions of the Individual Defendants. It is appropriate to treat the

---

[3] Defendants GCAH, GCA, Sanford, Hagerty, Maskatiya, Cucinotta, M&C, Summit Partners, JP Morgan, Goldman Sachs, and Deloitte will sometimes be referred to collectively as "Defendants" herein.

Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and public statements, as alleged herein was the result of the collective actions of the Individual Defendants identified above. The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company, its miscoding of commissions, its lack of adequate internal controls, its understatement of costs of revenue and overstatement of gross profit margins and net income, and its business, operations, and prospects for growth, as alleged herein.

33.     The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and/or misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

34.     As officers and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would

be based upon truthful and accurate information.   The Individual Defendants' material misrepresentations and/or omissions during the Class Period violated these specific requirements and obligations.

35.    The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies or notice of the documents and statements alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, they are responsible for the accuracy of the public reports and releases detailed herein.

36.    The Individual Defendants participated in preparing and/or approving the public reports and other statements and communications described above and discussed more fully herein.  Each of the Individual Defendants knew or recklessly disregarded the fact that the false and misleading statements and/or omissions complained of herein would adversely affect the integrity of the market for GCAH's stock, and would cause the price of GCAH's common stock to become artificially inflated.  Each of the Individual Defendants acted negligently, knowingly or in such a reckless manner so as to constitute a fraud and deceit upon Plaintiff and the Class.

37.    Each of the Defendants is liable as a participant in a scheme, plan and course of conduct that operated as a fraud and deceit on Class Period purchasers of the Company's common stock.  Throughout the Class Period, Defendants disseminated materially false and/or misleading statements and suppressed material adverse facts about the Company's financial

shenanigans with respect to the miscoding of, and failure to pay, customer commissions to boost GCAH's financial picture.

## V.    DEFENDANTS' FRAUDULENT SCHEME

38.    In 2004, Defendants Maskatiya and Cucinotta, by and through and/or with the support and participation of the other named Defendants, began preparations to take GCAH public.  By September 22, 2005, the IPO was launched pursuant to a Prospectus and Registration Statement filed with the SEC, which showed that in the year preceding the IPO, GCAH's net income and revenues ballooned from $58 million in net income on $356 million in revenues in 2003 to $256 million in net income on $403 million in revenues in 2004.  Such figures – including an apparent dramatic reduction of operational expenses from almost $300 million to less than $150 million year-to-year, signaled to investors that GCAH was not only growing rapidly, but was becoming more efficient by obtaining better profit margins and reducing its costs of revenues.

39.    In the IPO, 16,064,157 shares of GCAH Common Stock priced at $14.00 per share were offered and sold to Plaintiff and other members of the investing public raising a total of more than $250 million.  Of those shares, 9,000,000 were sold and offered by the Company and 7,064,157 were sold and offered by selling stockholders including Defendants M&C (owned and controlled by Defendants Maskatiya and Cucinotta) and Summit Partners.

40.    The Prospectus described GCA's business and indicated that its revenues were generated from the service fees it charges customers in gaming establishments in exchange for a cash advance.  The largest costs are the interchange fees it pays, usually to Visa or MasterCard, and the commission GCA pays to the gaming establishment where its services are offered.

41.    The Prospectus described GCA's principal costs of revenues as follows:

*Cost of Revenues.*

Cost of revenues are costs and expenses directly related to the general of revenue. For cash advance, ATM and, to a lesser extent, check services, we pay a commission to the gaming establishment at which the transaction occurs. Commissions are the largest component of cost of revenues. We expect commissions to increase as a percentage of revenue as new contracts are signed or existing contracts are renewed….

42.    Similarly, the Prospectus commented on the Company's results of operations by stating that "the largest component of cost of revenues is commissions, and commissions increased 10.0% in the 2005 period as contracts were signed or renewed at higher commission rates than experienced in the 2004 period, due to competitive pressures…. We expect that commissions, due to competitive pressures…will continue to increase, and we expect that in the balance of 2005 cost of revenues will increase at a rate faster than revenues." Nevertheless, the Prospectus disclosed that GCAH "expect[s] that, even though cost of revenues will grow more rapidly than revenues, gross profit for the final two quarters of 2005 will be higher than in the comparable 2004 period."

### A.    GCAH Delays The Filing Of Its 10-Q Pending A Confidential, Internal Investigation

43.    On November 14, 2007, the Company stunned the market when it announced that it was delaying the filing of its Quarterly Report for the period ending September 30, 2007, on account of the need for an internal investigation spawned by the allegations of financial reporting shenanigans by a whistleblower. The Company announced that an independent committee of the Board was formed and that independent counsel was hired to conduct the internal investigation. While no further details were revealed, GCAH's stock price plummeted, losing 60% of its value in one trading day, and obliterating over $400 million in market capitalization.

44.    Analysts and investors would have to wait close to a month before management addressed the public with respect to the investigation, causing the stock price to trade down to a historic low of $3.00 per share on December 5, 2007.  Two days later, GCAH's new CEO, Scott Betts ("Betts"), hosted a conference call with analysts in an effort to stem the tide.  Betts first revealed during this conference call that the investigation uncovered the so-called "miscoding" of commissions, which caused the Company to report inflated financial results in at least 2005 and 2006, and further caused the Company to short-change its customers.  Betts claimed that the issues related to "interpretations" of certain clauses in GCAH's customer contracts, but that the investigation-to-date estimated that the total costs of resolving the problems, including fixing internal systems and controls, would not exceed $10 million.

45.    The same day as Betts' conference call, on December 7, 2007, a Deutsche Bank analyst expressed serious skepticism, as follows:

> **What we still do not know.**  Though GCA's $10mm all-in est. suggests that its financial exposure is likely to be ltd, there are too many unknowns associated w/ the ongoing investigation to put us completely at ease.  At this point, it is unclear how many of GCA's top clients may have been affected or if this type of event could trigger an exit clause in those customers' contracts.  Though GCA did not change its 2007 outlook, the fact that guidance is likely based on the same flawed methods for cal. commissions and reporting transactions questions the reliability of this outlook, in our view.  We do not yet know whether the issues uncovered will warrant a financial restatement.  We also note there are other pieces of the investigation that remain confidential.  Add to this the series of missteps by the co. prior to the internal investigation, and we remain on the sidelines for now.  Maintain Hold.  (Emphasis in original).

### B. GCAH Concludes Its Investigation With Additional Commission Payouts "Possible"

46.     On December 21, 2007, investor and analyst concerns were partially assuaged when GCAH announced that its investigation was complete, reaffirming its prior estimate that the costs of resolving its "issues" would not exceed $10 million.

47.     On January 30, 2008, however, when the Company filed its delayed 10-Q for the September 30, 2007 reporting period, the news was not as upbeat as investors had hoped. While it was disclosed that the Company's all-in costs resulting from the investigation were in-line with, or slightly under, the $10 million guidance previously provided by the Company, the Company also disclosed that its problems were far from over.

48.     Specifically, the Company revealed that while it believes "that commissions have been computed and paid in accordance with our business understanding with the relevant customers, *we believe that it is probable that there will be disputes between us and the relevant customers regarding the amounts we actually paid*" and that "*[i]t is reasonably possible that we will be required to pay additional amounts to settle commission disputes related to our reporting of commissionable transactions.*" (emphasis added).

49.     Since its precipitous decline in November 2007 following disclosure of the "investigation" that led to the Company's admission that it had been calculating commissions improperly, GCAH's stock has never recovered, and the Company's attempt to downplay the significance of its misstatements in its delayed 10-Q on January 30 did little to reassure the market. GCAH's stock price closed at just $6.64 per share on February 13, 2008, down considerably from the closing price of $9.20 immediately before the November 14, 2007 announcement.

## VI.    THE DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS

50.    Throughout the Class Period, Defendants issued numerous false and misleading statements regarding its cost of revenues, gross profit margins and net income.

### A.    Defendants' False And Misleading Statements During 2005

51.    On or about September 22, 2005, GCA filed with the SEC the Registration Statement, which included the Prospectus, with respect to the IPO.

52.    The Prospectus described GCA's principal costs as follows:

> *Cost of Revenues.*
>
> Cost of revenues are costs and expenses directly related to the general of revenue.  For cash advance, ATM and, to a lesser extent, check services, we pay a commission to the gaming establishment at which the transaction occurs.  Commissions are the largest component of cost of revenues.  We expect commissions to increase as a percentage of revenue as new contracts are signed or existing contracts are renewed….

53.    Similarly, the Prospectus commented on the Company's results of operations by stating that:

> *Cost of Revenues.*
>
> Cost of revenues increased 14.1% from $130.4 million to $148.7 million.  The largest component of cost of revenues is commissions, and commissions increased 10.0% in the 2005 period as contracts were signed or renewed at higher commission rates than experienced in the 2004 period, due to competitive pressures.  The second-largest component of cost of revenues is interchange; interchange expenses increased 23.6%.  Warranty expenses increased 26.7%.  We expect that commissions, due to competitive pressures and interchange will continue to increase, and we expect that in the balance of 2005 cost of revenues will increase at a rate faster than revenues.
>
> Primarily as a result of the factors described above, gross profit increased 13.5%, from $64.7 million to $73.4 million.  We expect that, even though cost of revenues will grow more rapidly than

revenues, gross profit for the final two quarters of 2005 will be higher than in the comparable 2004 period.

54.    The Prospectus was signed by the Individual Defendants, and the statements quoted above were materially false or misleading because they failed to disclose that:  (a) the Company's internal controls were deficient, or ignored, causing its finance and accounting departments to be unable to accurately calculate the amount of commissions payable to the company's customers; (b) GCAH had improperly computed the amount of commissions it was required to pay many of its customers resulting in the company failing to comply with contractual terms; and (c) GCAH's operational expenses (*i.e.* cost of revenues) during 2005 were understated resulting in an overstatement of gross profit margins and net income.

**B.    Defendants' False And Misleading Statements During 2006**

55.    On March 23, 2006, the Company filed its Annual Report Form 10-K for the reporting period ending December 31, 2005 (the "2005 Annual Report"), which was signed by each of the Individual Defendants.  The 2005 Annual Report materially misstated the Company's financial results by understating costs of revenues and operating expenses while at the same time overstating gross profit margins and net income.

56.    In addition to signing the 2005 Annual Report, Defendants Sanford and Hagerty both certified as follows:

    1.    I have reviewed this annual report on Form 10-K of Global Cash Access Holdings, Inc.;

    2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

    3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all

material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

57.    As stated in the Company's January 30, 2008 10-Q, reporting the results of its investigation and the impact of the investigation in its financial reporting in 2005 and 2006, the 2005 Annual Report was materially false and misleading because, among other things, (a) GCAH had improperly computed the amount of commissions it was required to pay many of its customers resulting in the company failing to comply with contractual terms; and (b) GCAH's operational expenses (*i.e.* cost of revenues) during 2005 were understated resulting in an overstatement of gross profit margins and net income.  In addition, the statements quoted above from the Sanford and Hagerty certifications were materially false or misleading because they failed to disclose that:  (a) the Company's internal controls were deficient, or ignored, causing its finance and accounting departments to be unable to accurately calculate the amount of commissions payable to the company's customers; (b) GCAH had improperly computed the amount of commissions it was required to pay many of its customers resulting in the company failing to comply with contractual terms; and (c) GCAH's operational expenses (*i.e.* cost of revenues) during 2005 were understated resulting in an overstatement of gross profit margins and net income.

58.    In addition, the statements contained in the certifications of Defendants Sanford and Hagerty filed with the 2005 Annual Report were materially false and misleading because one year later, despite the fact no internal control changes were implemented during the 2006 reporting period, Defendants Sanford and Hagerty concluded that the Company ***did not*** maintain effective internal control over financial reporting as of December 31, 2006, because of material weaknesses in internal controls including, among other things, inadequate controls related to

commissions.  Since nothing had changed with respect to such controls in the 2006 reporting period year, Defendants Sanford and Hagerty either deliberately or recklessly turned a blind eye to such internal control deficiencies in prior reporting periods, while falsely certifying that they had designed and maintained effective internal controls when they plainly had not.

59.    Also in GCAH's 2005 Annual Report, Deloitte audited the consolidated financial statements of the Company and consented to the inclusion of its "Report of Independent Registered Public Accounting Firm" (the "Audit Report") in the Company filing.  Deloitte issued and included a clean and unqualified Audit Report, stating (among other things) that

> In our opinion,…[the] consolidated financial statements [of GCAH] present fairly, in all material respects, the financial position of [GCAH] and subsidiary at December 31, 2005 and 2004, and the results of operations and their cash flows for each of the three years in the period ended December 31, 2005, in conformity with accounting principles generally accepted in the United States of America.

60.    These statements by Deloitte were materially false or misleading because they failed to disclose that:  (a) the Company's internal controls were deficient, or ignored, causing its finance and accounting departments to be unable to accurately calculate the amount of commissions payable to the company's customers; (b) GCAH had improperly computed the amount of commissions it was required to pay many of its customers resulting in the company failing to comply with contractual terms; and (c) GCAH's operational expenses (*i.e.* cost of revenues) during 2005 were understated resulting in an overstatement of gross profit margins and net income.

61.    In addition, these statements by Deloitte were materially false and misleading because one year later, despite the fact no internal control changes were implemented during the reporting period, Deloitte concluded that the Company did not maintain effective internal control over financial reporting as of December 31, 2006, because of material weaknesses in internal

controls, including, among other things, inadequate controls related to commissions. Since nothing had changed with respect to such controls in the 2006 reporting period, Deloitte either deliberately or recklessly turned a blind eye to such internal control deficiencies in prior reporting periods.

### C.    Defendants' False And Misleading Statements During 2007

62.    On March 30, 2007, the Company filed its Annual Report Form 10-K for the reporting period ending December 31, 2006, (the "2006 Annual Report"), which was signed by each of the Individual Defendants. The 2006 Annual Report materially misstated the Company's financial results by understating costs of revenues and operating expenses while at the same time overstating gross profit margins and net income.

63.    In addition to signing the 2006 Annual Report, Defendants Sanford and Hagerty both certified as follows:

> 1.    I have reviewed this annual report on Form 10-K of Global Cash Access Holdings, Inc.;
>
> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a.    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant,

including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        b.  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        c.  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        d.  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

      5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

        a.  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

        b.  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

      64.    As stated in the Company's January 30, 2008 10-Q, reporting the results of its investigation and the impact of the investigation in its financial reporting in 2005 and 2006, the 2006 Annual Report was materially false and misleading because, among other things, (a) GCAH had improperly computed the amount of commissions it was required to pay many of its customers resulting in the company failing to comply with contractual terms; and (b) GCAH's

operational expenses (*i.e.* cost of revenues) during 2006 were understated resulting in an overstatement of gross profit margins and net income. In addition, the statements quoted above from the Sanford and Hagerty certifications were materially false or misleading for the same reasons.

65.    On May 10, 2007, the Company filed its Quarterly Report Form 10-Q for the reporting period ending March 31, 2007, (the "1st Quarter 2007 Report"), which was signed by each of the Individual Defendants. The 1st Quarter 2007 Report materially misstated the Company's financial results by understating costs of revenues and operating expenses while at the same time overstating gross profit margins and net income.

66.    In addition to signing the 1st Quarter 2007 Report, Defendants Sanford and Hagerty both certified as follows:

> 1.    I have reviewed this quarterly report on Form 10-Q of Global Cash Access Holdings, Inc.;
>
> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a.    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others

26

within those entities, particularly during the period in which this report is being prepared;

       b.  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

       c.  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

       d.  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

       5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

       a.  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

       b.  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

       67.    As stated in the Company's January 30, 2008 10-Q, reporting the results of its investigation and the impact of the investigation in its financial reporting in 2005 and 2006, the 1st Quarter 2007 Report, was materially false and misleading because, among other things, (a) GCAH had improperly computed the amount of commissions it was required to pay many of its customers resulting in the company failing to comply with contractual terms; and (b) GCAH's

operational expenses (*i.e.* cost of revenues) during the reporting period were understated resulting in an overstatement of gross profit margins and net income. In addition, the statements quoted above from the Sanford and Hagerty certifications were materially false or misleading for the same reasons.

68. On August 14, 2007, the Company filed its Quarterly Report Form 10-Q for the reporting period ending June 30, 2007, (the "2nd Quarter 2007 Report"), which was signed by each of the Individual Defendants. The 2nd Quarter 2007 Report materially misstated the Company's financial results by understating costs of revenues and operating expenses while at the same time overstating gross profit margins and net income.

69. In addition to signing the 2nd Quarter 2007 Report, Defendants Sanford and Hagerty both certified as follows:

> 1. I have reviewed this quarterly report on Form 10-Q of Global Cash Access Holdings, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others

28

within those entities, particularly during the period in which this report is being prepared;

        b.  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        c.  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        d.  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

      5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

        a.  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

        b.  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

      70.    As stated in the Company's January 30, 2008 10-Q, reporting the results of its investigation and the impact of the investigation in its financial reporting in 2005 and 2006, the 2nd Quarter 2007 Report, was materially false and misleading because, among other things, (a) GCAH had improperly computed the amount of commissions it was required to pay many of its customers resulting in the company failing to comply with contractual terms; and (b) GCAH's

operational expenses (*i.e.* cost of revenues) during the reporting period were understated resulting in an overstatement of gross profit margins and net income.  In addition, the statements quoted above from the Sanford and Hagerty certifications were materially false or misleading for the same reasons.

## VII.    APPLICABLE GAAP VIOLATIONS

71.    Federal Regulations strictly govern what must be included in documents filed with the SEC.  Specifically, Regulation S-K provides, in part, that annual and period reports must contain a section entitled "Management's discussion and analysis of financial condition and results of operations" (the "Management Discussion").  *See* 17 C.F.R. § 229.10, *et seq.*

72.    Items 303 of Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), governs what must be contained in the Management Discussion.  Item 303 requires, in part, that the Management Discussion must:

> Discuss registrant's financial condition, changes in financial condition and results of operations.  The discussion shall provide information as specified in paragraphs (a)(1) through (5) of this Item and also shall provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations.

73.    Paragraph (a)(3) of Item 303 requires, in part, that the Management Discussion discuss a company's "results of operations" as follows:

> (i)    Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> (ii)    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price

increases or inventory adjustments), the change in the relationship shall be disclosed.

74.    Congress provided instructions in the Notes to Item 303(a) to clarify what is required of publicly-filing companies like GCAH.  Instructions 1 - 3 provide:

1.    The registrant's discussion and analysis shall be of the financial statements and of other statistical data that the registrant believes will enhance a reader's understanding of its financial condition, changes in financial condition and results of operations. Generally, the discussion shall cover the three year period covered by the financial statements and shall use year-to-year comparisons or any other formats that in the registrant's judgment enhance a reader's understanding. However, where trend information is relevant, reference to the five year selected financial data appearing pursuant to Item 301 of Regulation S-K (§ 229.301) may be necessary.

2.    The purpose of the discussion and analysis shall be to provide to investors and other users information relevant to an assessment of the financial condition and results of operations of the registrant as determined by evaluating the amounts and certainty of cash flows from operations and from outside sources.

3.    The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

75.    The Defendants had knowledge of material adverse information concerning GCAH's practice of miscoding commission liabilities so as to create the appearance of a lower cost of revenue, and higher revenues, profit margins, and net income during the Class Period, and had an obligation to disclose such adverse information pursuant to Regulation S-K, Item 303.  Their failure to do so renders their Class Period SEC filings materially incomplete, false and misleading.  The materially incomplete, false and misleading SEC filings include:  the Company's Annual Report Form 10-Ks for reporting periods ending December 31, 2005, and December 31, 2006, and its Quarterly Report Form 10-Qs for the reporting periods ending March 31, 2007, and June 30, 2007.

## VIII.    SCIENTER/FRAUDULENT INTENT

### A.    The Individual Defendants

76.    As alleged herein, the Company and the Individual Defendants acted with scienter.   The Individual Defendants, each and/or together in concert, knowingly, or with extreme departure from standards of ordinary care so as to amount to recklessness:   (a) engaged in acts, practices and a scheme and course of business that artificially inflated GCAH's stock price during the Class Period; and/or (b) issued, or caused GCAH to issue, materially false and misleading statements (or acquiesced in the issuance of such statements) that artificially inflated GCAH's stock price during the Class Period.

77.    The principal purpose and effect of the Individual Defendants' fraudulent conduct was to inflate the price of GCAH's shares by creating the false impression that GCAH was reducing operational expenses and increasing gross margins and net income.   Among other things, this price inflation was orchestrated to allow GCAH insiders (including its CEO and CFO) to cash-in on stock option awards while GCAH's stock was trading at a high level and before the inevitable collapse in the stock price that would occur as a result of revealing the truth to the market.

78.    The Individual Defendants', by virtue of their executive management positions, their positions as members of the Board of Directors of the Company, and (with respect to Sanford, Maskatiya and Cucinotta) their long history at the Company and deep knowledge of its operations, had unfettered access to undisclosed adverse information regarding the Company's true state of affairs vis-à-vis miscoding of commissions, lack of adequate internal controls, and its resultant effect on the Company's reported costs of revenue, liabilities, gross profit margins and net income.   The Individual Defendants also had access to undisclosed adverse information

regarding the Company's business, operations, operational trends, finances, and present and future business prospects.

79.     The Individual Defendants learned and understood such information through GCAH's internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as GCAH officers and/or directors.  By virtue of their positions, and their unique and unfettered access to Company information, the Individual Defendants were, therefore, well-aware that (a) the Company's internal controls were deficient, or were disregarded, causing it to be unable or unwilling to accurately calculate the amount of commissions payable to the Company's customers; (b) GCAH had improperly computed the amount of commissions it was required to pay many of its customers resulting in the Company failing to comply with contractual terms, SEC rules and regulations, and federal securities laws; and (c) GCA's expenses (*i.e.* cost of revenues) during at least 2005 and 2006 were understated resulting in an overstatement of gross profit margins and net income at least for the periods December 31, 2005, December 31, 2006, and for the quarters ending March 31, 2007 and June 30, 2007.

80.     At all material times, the Individual Defendants directly participated in the management of the Company at the highest levels, and were directly involved in the day-to-day operations of the Company.  They were, therefore, privy to confidential proprietary information concerning the Company, its miscoding of commissions, its lack of adequate internal controls, its understatement of costs of revenue and overstatement of gross profit margins and net income,

and its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

81.    The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and/or misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

82.    The Individual Defendants were provided with copies or notice of the documents and statements alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Each of the Individual Defendants knew or recklessly disregarded the fact that the false and misleading statements and/or omissions complained of herein would adversely affect the integrity of the market for GCAH's stock, and would cause the price of GCAH's common stock to become artificially inflated.  Each of the Individual Defendants acted knowingly or in such a reckless manner so as to constitute a fraud and deceit upon Plaintiff and the Class.

83.    The Individual Defendants also had ample tools at their disposal to detect the financial shenanigans detailed herein.  Thus, the Individual Defendants either knew that the statements they made throughout the Class Period were untrue or, in the alternative, given their management styles and the systems and controls in place at GCAH to detect the type of financial shenanigans at issue, recklessly disregarded the existence of it.

**B.    The Underwriter Defendants**

84.    JP Morgan and Goldman Sachs, as co-lead underwriters to GCAH's IPO had unfettered access to the financial and corporate records of GCAH and similarly had unfettered

access to the Company's management.  As part of their duties as co-lead underwriters, the Underwriter Defendants were required to conduct, prior to the offerings of the Company's securities, a reasonable investigation of the Company to ensure that the statements contained in the Registration Statement and Prospectus contained no misstatement or omission of material fact.

85.    The Underwriter Defendants failed to conduct a reasonable investigation of the statements contained in the Registration Statement or Prospectus, or they conducted such an investigation but ignored their findings, and so the Underwriter Defendants did not possess reasonable grounds for believing that the statements in those documents were true and not misleading.  In particular, the Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the textual descriptions in the Registration Statement or Prospectus relating to, among other things, the Company's past performance, operations, business condition, and future prospects.  Nor did the Underwriter Defendants conduct a reasonable investigation into the accuracy of the financial information included in the Registration Statement or Prospectus, including the financial information contained in the textual portions of those documents, as well as that contained in the attached audited and unaudited financial statements.

86.    In addition, the Registration Statement and Prospectus contained risk factors relating to, among other things, the Company's costs of revenues, customer relationships, and its internal controls over financial reporting.  Having identified these factors as risks for potential investors, the Underwriter Defendants were obligated to, but did not, conduct an especially diligent investigation into these issues in order to obtain reasonable assurance that the statements contained in the Registration Statement and Prospectus were true and not misleading.

### C.    Deloitte & Touche LLP

87.    Deloitte was GCAH's auditor throughout the Class Period, and had been auditor of GCAH's predecessor entities since 2000.  As a result of its longstanding relationship with GCAH and its management team, Deloitte had an intimate knowledge of the Company's business.  By virtue of the nature of the accounting and auditing services rendered to the Company, particularly those leading up to the IPO, Deloitte personnel were regularly present at GCAH's corporate headquarters and had continual access to and knowledge of GCAH's private and confidential corporate financial and business information, including internal monthly financing statements, Board minutes, and internal memoranda, and thus was aware of the true facts as alleged herein concerning the GCAH's costs of revenues and gross margins.

88.    Throughout the Class Period, Deloitte personnel reviewed public filings, earnings releases, and quarterly financial reports released by the Company, and had continual and unfettered access to, and knowledge of, GCAH's internal corporate, financial, operating and business information supporting (or not supporting) the same.  By virtue of its continual and complete access, moreover, Deloitte had ample ability to correct and prevent GCAH's fraud, but did not nothing but stand idly by as GCAH deceived the market.

### D.    All Named Defendants Had A Common Motive And Opportunity To Lie

89.    All Defendants named herein had a common motive to deceive the market by making material misrepresentation and concealing adverse information from the market.  All Defendants stood to gain, and did in fact gain, millions of dollars in profits on account of the success of GCAH's IPO and its Secondary Offering.  All named Defendants further stood to gain significant additional profits by maintaining a high stock price throughout the Class Period so that additional insider sales could be accomplished and many more millions of dollars gained.

### 1.    Defendant Maskatiya's and Cucinotta's Insider Trading

90.    No one stood to gain more from the successful IPO and Secondary Offering of GCAH than the founders of the Company and principal stockholders, Defendants Maskatiya and Cucinotta. Further, because of their large holdings, no one stood to gain more than Defendants Maskatiya and Cucinotta from the continued maintenance of high stock price.

91.    And gain they did. In 2006 alone, Maskatiya and Cucinotta (through entities they owned and controlled, including Defendant M&C) sold over 50 million shares of their GCAH stock realizing proceeds of over $75.5 million.

92.    Just two months before the release of the news in November 2007 that GCAH was delaying the filing of their 10-Q to conduct an internal investigation, Maskatiya sold an additional 74,200 shares of his personal holdings for an additional $922,000.

### 2.    Defendant Sanford's Insider Trading

93.    Defendant Sanford also profited handsomely while misleading the market and concealing adverse information from the public. During the year preceding the dramatic drop in GCAH's stock price on November 14, 2007, Defendant Sanford disposed of only small portions of his personal stock holdings in the Company at relatively regular intervals, but never more than 80,000 shares at a time. In the months leading up to the collapse of GACH's stock price, however, Sanford traded in suspiciously-high amounts, disposing of over 177,000 shares on September 7, 2007, and another 119,000 shares on November 1, 2007 netting proceeds of over $3.1 million.

94.    The insider trading proceeds achieved by Sanford as a result of his stock sales during September and November 2007 far exceeded his annual cash compensation as President and CEO of GCAH, which amounted to just over $662,000 in 2007.

### 3. Defendant Hagerty's Insider Trading

95.     Defendant Hagerty was similarly fortunate to have cashed out of his GCAH stock positions just months in advance of the stock's massive collapse. On July 27, 2007, Hagerty sold a total of 59,052 shares of GCAH stock realizing proceeds of for more than $840,000.

96.     The insider trading proceeds achieved by Hagerty as a result of his well-timed stock sales during July 2007 far exceeded his annual cash compensation at GCAH, which amounted to just over $760,000 in cash and bonus compensation for all of 2006 and 2007 combined.

### 4. The Underwriting Defendants

97.     Defendants JP Morgan and Goldman Sachs also received a substantial profit on account of the successful IPO and run up on GCAH securities. As co-lead underwriters, JP Morgan and Goldman Sachs were directly responsible for the distribution and sale of almost 8 million shares sold in the IPO with respect to which the $0.98 per share underwriting discount resulted in total fees of almost $8 million shared roughly equally between Goldman Sachs and JP Morgan.

### 5. Defendant Deloitte

98.     Defendant Deloitte was also significantly motivated to actively conceal or recklessly disregard GCAH's problems, and it participated and acquiesced in concealing the commission-miscoding issues from the public. GCAH was a company that actively anticipated conducting an IPO. The IPO market in 2004 and 2005 had slowed substantially from previous years, and so accounting firms like Deloitte desperately sought out this lucrative work. In this sluggish market environment, the prospect of acting as GCAH's auditor in connection with its IPO substantially motivated Deloitte to appease GCAH, and to ensure that GCAH experienced a successful IPO.

## IX.    FRAUD ON THE MARKET

99.    At all relevant times, the market for GCAH's common stock was efficient for the following reasons, among others:

    a.    GCAH's common stock met the requirements for listing, and was listed and actively traded on the NYSE (symbol GCA), a highly efficient and automated market;

    b.    As a regulated issuer, GCAH filed regular reports with the SEC;

    c.    GCAH regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

    d.    GCAH was regularly followed by numerous securities analysts employed by major brokerage firms headquartered in the United States and overseas who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

    e.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of GCAH's securities; and

    f.    Without knowledge of the misrepresented or omitted facts, Plaintiff purchased or otherwise acquired GCAH's common stock between the time that the Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of GCAH's common stock was artificially inflated by the Defendants' misrepresentations and omissions.

100.    As a result of the foregoing, the market for GCAH's common stock promptly reacted to current information regarding GCAH from publicly available sources, and reflected such information in the trading price of GCAH's common stock.  Under these circumstances, a presumption of reliance applies.

## X.    NO SAFE HARBOR

101.    As alleged herein, the Defendants acted with scienter because at the time that they issued public documents and other statements in GCAH's name, they knew or recklessly disregarded the fact that such statements were materially false and misleading, or omitted to

disclose material facts. Moreover, the Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

102.    As set forth in detail throughout the Complaint, the Defendants, by virtue of their control over, and/or receipt of GCAH's materially misleading statements, and their positions with the Company which made them privy to confidential proprietary information concerning GCAH's inadequate and ineffective internal controls, including lack of appropriate controls over the Company's calculation, tracking and payment of commissions, used such information to artificially inflate GCAH's financial results. The Defendants created, were informed of, participated in, and knew of, the scheme alleged herein to distort and suppress material information pertaining to GCAH's practices. With respect to non-forward looking statements and omissions, the Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

103.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements pleaded herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

104.    In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of GCAH who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made.    None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## XI.    LOSS CAUSATION

105.    Plaintiff and the Class (as defined below) were damaged as a result of the Defendants' fraudulent conduct as set forth herein.    From September 22, 2005 to November 14, 2007, inclusive (the "Class Period"), the Defendants repeatedly misrepresented and/or failed to disclose material information causing Plaintiff to suffer damages when the truth slowly began to be revealed to the market.

106.    By the time the Company issued its Registration Statement and Prospectus on September 22, 2005 (the beginning of the Class Period), the Defendants were aware or should have been aware that (a) GCAH lacked adequate internal controls, or disregarded such controls, resulting in the Company's failure to account for the amount of commissions payable to the

Company's customers; (b) GCAH improperly coded and calculated such commissions and breached the terms of contracts with its customers; (c) GCAH's failure to properly compute and account for commissions payable to the Company's customers resulted in the Company understating its operational expenses and overstating its gross profit margins and net income. Thus, the Company was aware or should have been aware that its earnings and business was going to be worse going-forward.

107.    GCAH's stock was first offered at an IPO price of $14 and quickly rose to a Class Period high $19.49 on April 28, 2006, only seven months after the IPO.

108.    At least two corrective disclosures by GCAH resulted in losses suffered by the Plaintiff.  As the stock price chart for the Class Period below shows, corrective disclosures on August 9, 2007 and again on November 14, 2007 caused Plaintiff to suffer massive losses:



109.    On August 9, 2007, in the wake of the departure of former CFO, Defendant Hagerty, GCAH announced disappointing guidance.  As a result of these disclosures, GCAH's

stock price suffered a decline of more $3 dollars per share during the day, dropping from $15.20 on August 8, 2007 to close at $12.21 on August 9, 2007. The stock continued to track lower, trading at around $11 dollars per share until the Company's November disclosures sent the stock plummeting further.

110.    On November 14, 2007, after the close of the markets and only two weeks after its President and CEO (Defendant Sanford) resigned, GCAH announced that it would be delaying the filing of its Quarterly Report Form 10-Q for the period ending September 30, 2007 pending an internal investigation under the direction of an independent committee of the Board, with the assistance of independent counsel, into undisclosed allegations being raised by a whistleblower. GCAH's stock price plummeted $5.41 per share from $9.20 on November 14, 2007 to $3.71 per share on November 15, 2007, representing a one day decline of 60% on extremely heavy trading volume of nearly 3.8 million shares (versus the average daily volume of less than 500K shares). In this one trading day, over $400 million of market capitalization was wiped out.

111.    During this time, Plaintiff and thousands of Class Members, purchased GCAH's stock at artificially inflated prices. Plaintiff and the Class suffered damages as the truth was revealed to investors, negatively affecting GCAH's stock price.

## XII.    CLASS ACTION ALLEGATIONS

112.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased GCAH's securities during the Class Period and who suffered damages as a result of their purchases (the "Class"). Excluded from the Class are: (1) the Defendants; (2) members of the immediate family of each of the Individual Defendants; (3) the subsidiaries or affiliates of the Company or any of the Defendants; (4) any person or entity who is, or was during the Class

Period, a partner, officer, director, employee or controlling person of the Company or any of the Individual Defendants; (5) any entity in which any of the Defendants has a controlling interest; (6) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph; and (7) the insurance carriers, or their affiliates who insure the Defendants.

113.    The members of the Class are so numerous that joinder of all members is impracticable.  As of June 4, 2008, there were approximately 77 million shares of GCAH's common stock outstanding.  While Plaintiff does not know the exact number of Class members, Plaintiff believes that there are, at minimum, thousands of members of the Class who purchased GCAH's common stock during the Class Period.

114.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

115.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    Whether the federal securities laws were violated by the Defendants' acts and omissions as alleged herein;

b.    Whether the Company's SEC filings, and other public statements published and disseminated to the investing public and to purchasers of the Company's common stock during the Class Period omitted and/or misrepresented material facts about the business affairs, financial condition and present and future prospects of the Company;

c.    Whether the Defendants omitted to state and/or misrepresented material facts about the financial condition, profitability and present and future prospects of the Company;

d.    With respect to Plaintiff's claims under Section 10(b) of the Exchange Act, whether the Defendants acted willfully or recklessly in omitting to state and/or misrepresenting material facts about the financial condition, profitability and present and future prospects of the Company;

e.     Whether the market price of GCAH's securities during the Class Period was artificially inflated due to the non-disclosures and/or misrepresentations complained of herein;

f.     Whether the Individual Defendants and the Underwriter Defendants conducted a reasonable investigation giving them reasonable grounds to believe that at the time the Registration Statement and Prospectus and Second Registration Statement and Second Prospectus became effective, that the statements contained therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading;

g.     Whether Defendants Maskatiya, Cucinotta, M&C and Summit Partners were control persons of GCA at the time of the IPO; and,

h.     Whether the members of the Class have sustained damages, and if so, the proper measure thereof.

116.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation. Plaintiff has no interests that are adverse or antagonistic to the Class.

117.    A class action is superior to other available methods for fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, the expense and burden of individual litigation make it impossible for the Class members individually to redress the Defendants' wrongful conduct. Furthermore, Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

## XIII.   COUNTS

### COUNT ONE

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b) PROMULGATED THEREUNDER

118.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted against all Defendants except M&C International and Summit Partners.

119.    During the Class Period, the Defendants named herein: (a) deceived the investing public, including Plaintiff, as alleged herein; (b) artificially inflated and maintained the market prices of GCAH securities; and (c) caused Plaintiff to purchase or otherwise acquire GCAH's common stock at artificially inflated prices.

120.    The Defendants named herein made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and/or substantially participated in the creation of the alleged misrepresentations, which operated as a fraud and deceit upon Plaintiff and the Class, in an effort to maintain artificially high market prices for GCAH's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).  The Defendants consistently made materially false and misleading statements and omitted to state material facts regarding GCAH's payment of and accounting for commissions payable to its customers causing the Company to misstate, *inter alia*, its costs of revenues, gross profit margins, and net income.

121.    As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, the Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-K (17 C.F.R. §

229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information. With regard to GCAH's accounting for commissions and its disclosure of costs of revenues, gross profit margins and net income, the Defendants consistently failed to perform this duty.

122.    The Defendants, directly and indirectly, by use of the means and instrumentalities of interstate commerce and/or the mails, made, or substantially participated in the creation of, untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made about GCAH's accounting for commissions, and its disclosure of costs of revenues, gross profit margins and net income, in light of the circumstances under which they were made, not misleading, as set forth herein.

123.    The Defendants had actual knowledge of the misrepresentations and/or omissions of material fact set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

124.    The facts alleged herein give rise to a cogent and compelling inference that each of the Defendants acted with scienter. The Defendants' own internal information concerning miscoding of commissions provided the Defendants with information showing that GCAH was consistently misstating its costs of revenues, gross profit margins, and net income during the Class Period. The Defendants knew or recklessly disregarded that the financial results publicly disseminated to investors during the Class Period were unreliable, and significantly driven by a false costs of revenue, gross profit margins and net income, all of which were closely-watched, material indicators of the Company's profitability.

125.    The Defendants carried out a deliberate scheme to prevent truthful information relating to its costs of revenues, gross profit margins and net income from being incorporated into GCAH's quarterly and annual financial statements that were publicly disseminated to investors.

126.    In addition to having actual knowledge and/or recklessly disregarding the fraudulent nature of their statements and conduct, each of the Defendants named herein also had a strong motive to engage in the fraudulent scheme set forth herein.  Maintaining a strong stock price was essential to maintaining the artificially inflated value of each of the Defendants' personal holdings of GCAH's shares.  Notwithstanding Defendants' knowledge of the miscoding of commissions to inflate the Company's financial figures, they knowingly and/or recklessly failed to disclose such material information.  Disclosure of the true facts would have seriously impaired GCAH's IPO, the Secondary Offering, GCAH's business, its stock price, and the Defendants' personal holdings.

127.    As a result of the dissemination of the materially false and misleading information and the failure to disclose material facts, as set forth above, the market price of GCAH's common stock was artificially inflated throughout the Class Period.  Unaware that the market price of GCAH's common stock was artificially inflated, and relying directly or indirectly on the false and/or misleading statements made by the Defendants, or upon the integrity of the market in which GCAH's common stock traded, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which any statements were made, and/or in the absence of material adverse information that was known to, or deliberately or recklessly disregarded by, the Defendants but not disclosed in public statements by the

Defendants, Plaintiff purchased or acquired GCAH's common stock at artificially high prices and was damaged when the truth was revealed.

128.    At the time of said misrepresentations and/or omissions, Plaintiff was ignorant of their falsity, and believed the false and/or misleading statements to be true.  Had Plaintiff known the truth about GCAH miscoding of commissions and the true state of its financial affairs, facts which were misrepresented and/or not disclosed by the Defendants, Plaintiff would not have purchased GCAH's common stock at all, or would not have done so at the artificially inflated prices paid for such common stock.

129.    The Defendants' materially false and misleading statements and/or omissions of material fact caused Plaintiff and the Class to suffer losses in connection with their investments in GCAH's common stock.  GCAH's stock price collapsed when the truth was revealed.  By November 14, 2007, the disclosure of GCAH's internal investigation of allegations of fraud by a whistleblower reduced the Company's share price by $5.41 per share, or over 60 percent, and caused a loss of market capitalization of more than $400 million.

130.    By reason of the foregoing, the Defendants named herein violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiff and the Class for damages suffered in connection with their purchases of GCAH's securities during the Class Period.

## COUNT TWO

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### AGAINST THE INDIVIDUAL DEFENDANTS

131.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted against the Individual Defendants.

132.    The Individual Defendants acted as controlling persons of GCAH within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their respective high-level positions and active participation in and/or awareness of the day-to-day operations at GCAH, each of the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various public statements and SEC filings that Plaintiff alleges were false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of reports, studies, press releases, public filings and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued and further had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

133.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

134.    As set forth in the preceding paragraphs of this Complaint, GCAH and the Individual Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a), 10b-5(b), and 10b-5(c) promulgated thereunder, and Section 18 of the Exchange Act.

135.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchases of GCAH's securities during the Class Period.

## COUNT THREE

### VIOLATION OF SECTION 11 OF THE SECURITIES ACT

136.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted under Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class against all Defendants.

137.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated.

138.    GCAH is the registrant for the IPO.   The Defendants named herein were responsible for ensuring the true and accurate contents of the Registration Statement and the Prospectus prior to its dissemination.

139.    As issuer of the shares, GCAH is strictly liable to Plaintiff and the Class for the misstatements and omissions.

140.    Defendants Sanford, Hagerty, Maskatiya and Cucinotta were Directors of GCA within the meaning of Section 11(a)(3) of the Securities Act at the time of the IPO and either personally or through an attorney-in-fact signed the Registration Statement.

141.    Defendants Goldman Sachs and JP Morgan were underwriters for the IPO within the meaning of Section 11(a)(5) of the Securities Act.

142.    Defendant Deloitte issued clean and unqualified audit reports attesting, *inter alia*, that the Registration Statement and Prospectus were fairly presented in all material respects.

143.    Defendants named herein either knew, or did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration

Statement and the Prospectus were true, not misleading, and were without omissions of any material facts.

144.    By reasons of the conduct herein alleged, Defendants violated Section 11 of the Securities Act, and Plaintiff, which acquired shares pursuant to the Registration Statement, and the Class sustained damages as a result of the substantial decline in value of GCAG securities due to Defendants' violations.

## **COUNT FOUR**

## **VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT**

145.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted against the Underwriter Defendants and the Insider Selling Entities.

146.    The Underwriter Defendants and the Insider Selling Entities each offered and sold GCA Common Stock or solicited the sale of such stock to the Class in the IPO and Secondary Offering by means of the Registration Statement and Prospectus and Second Registration Statement and Second Prospectus.

147.    The Registration Statement and Prospectus and Second Registration Statement and Second Prospectus included untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of the circumstances in which they were made, not misleading.

148.    Plaintiff and the members of the Class did not know, nor could they have known, of the truths or omissions contained in the Registration Statement and Prospectus and Second Registration Statement and Second Prospectus because the material matters contained therein were available to only corporate insiders and the Underwriter Defendants which were obligated

to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus and Second Registration Statement and Second Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  The Underwriter Defendants and Insider Selling Entities failed to make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statements and Prospectus and Second Registration Statement and Second Prospectus were accurate and complete in all material respects.

149.    By reason of the misconduct alleged herein, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act and are liable to Plaintiff and the members of the Class who purchased or acquired GCA Common Stock in the IPO and/or Secondary Offering, each of whom has been damaged as a result of such violations.

## COUNT FIVE

### VIOLATION OF SECTION 15 OF THE SECURITIES ACT

150.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted against Defendants Maskatiya, Cucinotta, M&C and Summit Partners.

151.    GCAH is a primary violator of Section 11 of the Securities Act.

152.    Defendant M&C was a control person of GCAH by virtue of its beneficial ownership of a large percentage of the Company's stock, having its two co-owners on GCAH's board of directors and its relationship and arrangements with other directors and Summit Partners.

153.    Defendants Maskatiya and Cucinotta were control persons of GCAH by virtue of their beneficial ownership of M&C, which was a control person of GCAH as described above, and their positions as directors of GCAH.

154.    Defendant Summit Partners was a control person of GCAH by virtue of its beneficial ownership of a large percentage of the Company's stock, having its representatives on GCAH's board of directors, and its relationship and arrangements with other directors and M&C.

155.    As control persons of GCAH, Defendants Maskatiya, Cucinotta, M&C and Summit Partners are liable under Section 15 of the Securities Act for GCA's violation of Section 11.

## XIV.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding compensatory damages against all of the Defendants, jointly and severally, in favor of Plaintiff and the Class, for all losses and damages suffered as a result of the Defendants' wrongdoing alleged herein, in an amount to be determined at trial, together with interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Plaintiff's attorneys and experts; and

D.      Awarding Plaintiff and the Class such other and further relief as the Court may deem just and proper.

## XV.    JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: June 10, 2008                                    GRANT & EISENHOFER P.A.

By:  _____

Jay W. Eisenhofer (Bar No. JWE5503)
Michael J. Barry
Jeff A. Almeida
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:     (646) 722-8500
Facsimile:      (646) 722-8501

*Attorneys for Plaintiff and Proposed*
*Lead Plaintiff for the Class*

# EXHIBIT A

## CERTIFICATION OF CITY OF RICHMOND
## RETIREMENT SYSTEM IN SUPPORT OF MOTION FOR APPOINTMENT AS
## LEAD PLAINTIFF AND FOR APPROVAL OF ITS SELECTION OF COUNSEL

The undersigned, Philip R. Langham, makes this Certification pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4, and states as follows:

1.    I am the Executive Director of the City of Richmond Retirement System and am authorized to make this Certification on behalf of the City of Richmond Retirement System ("Richmond").

2.    I have reviewed the Complaint filed by Richmond against Global Cash Access Holdings, Inc. ("GCAH") and others, and have authorized its filing.

3.    I have reviewed the records of Richmond's transactions in the securities of GCAH for the proposed class period ("Class Period"). Those transactions are listed in the chart attached as Schedule A to this Certification.

4.    Richmond intends to actively monitor and vigorously pursue this action for the benefit of the class, rather than simply relying on its attorneys. Richmond has retained the law firm of Grant & Eisenhofer P.A. to represent it. This firm is knowledgeable and experienced in securities law and litigation, particularly with regard to the role and responsibilities of institutional investors in class actions.

5.    Like other investors who purchased GCAH securities during the Class Period, Richmond believes that its losses occurred as a result of the defendants' fraudulent conduct and violations of the securities laws. Richmond believes that its claims against the defendants are typical of those of other members of the class.

6.    Richmond did not purchase the securities that are the subject of the various complaints at the direction of counsel or to participate in any private action

arising under the federal securities laws. Richmond invested in GCAH solely for its own business purposes.

7.     Richmond is willing to serve as the representative party on behalf of the class of GCAH security holders who invested during the Class Period. Richmond intends to pursue this litigation for the best interests of all class members and take whatever steps are necessary regardless of geographic location.

8.     During the three-year period preceding the date of this Certification, Richmond has not served or sought to serve as a representative party for a class in an action under the federal securities laws.

9.     Richmond will not accept any payment for serving as representative party on behalf of the class beyond its *pro rata* share of any recovery, except as ordered and approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: June __6__, 2008

_____
Philip R. Langham
Executive Director
City of Richmond Retirement System

2